Daniel deLEIRIS and Betsy deLeiris, individually and as parents and next friends of Sarah deLeiris, a minor; Ellen Weaver-Paquette and Joseph E. Paquette, Jr., individually and as parents and next friends of Jonathan Mason Paquette, a minor; Deborah A. Mycroft and Walter J. Mycroft III, individually and as parents and next friends of Kirstin Ann Mycroft, a minor; Becky Bessette and John Bessette, individually and as parents and next friends of Evan Albert Bessette, a minor; Kathy Gardiner and Gary K. Gardiner, individually and as parents and next friends of Joshua Tex Gardiner, a minor; Susan Closter-Godoy and Carlos Godoy, individually and as parents and next friends of Elizabeth C. Godoy, a minor; and Daniel deLeiris, Betsy deLeiris, Ellen Weaver-Paquette, Joseph E. Paquette, Jr., Deborah A. Mycroft, Walter J. Mycroft III, Becky Bessette, John Bessette, Kathy Gardiner, Gary K. Gardiner, Susan Closter-Godoy, and Carlos Godoy (each individually, and all as putative representatives of a proposed class consisting of all persons obligated to furnish information relative to the birth of children in the State of Rhode Island from August 29, 1983 to June 28, 1985), Plaintiffs,

v.

H. Denman SCOTT, M.D., in his capacity as Director of the Department of Health of the State of Rhode Island; Edward J. Martin, in his capacity as Registrar of Vital Statistics of the State of Rhode Island; Arlene Violet, in her capacity as Attorney General of the State of Rhode Island; and the State of Rhode Island, Defendants.

Civ. A. No. 85–0181–S.

United States District Court,
D. Rhode Island.

Sept. 10, 1986.

Kelly & Scott, Thomas W. Kelly, Newport, R.I., for plaintiffs.

Maureen A. Hobson, Atty., R.I. Dept. of Health, Arlene Violet, Atty. Gen., Thom Martin, Sp. Asst. Atty. Gen., Providence, R.I., for defendants.

## OPINION AND ORDER

SELYA, District Judge.

At bottom, this litigation protests what the plaintiffs view as a heavyhanded attempt by the sovereign to infringe the birthrights of newborn children in order to season an ill-considered mess of statistical pottage. The defendants demur. They see themselves as engaged in the routine collection of data for the public good, and unfairly beleaguered by the plaintiffs in the bargain. It falls to the court to outline the dimensions of the litigation and to determine who is harrassing whom.

Since its inception on April 1, 1985, the scope of this suit has been expanded and the initial statement of claim has evolved into a third amended complaint (complaint). The plaintiffs, whose identity is faithfully reflected in the case caption, comprise six married couples resident in Rhode Island. They sue individually, as parents, and on behalf of their respective newborn children, complaining of certain actions of the state of Rhode Island in demanding information and data from them ancillary to the issuance of birth certificates. They seek certification of a class, Fed.R.Civ.P. 23, a declaration that certain Rhode Island statutes and implementing regulations are offensive to the federal Constitution, injunctive redress of divers kinds, compensatory dam-

ages under 42 U.S.C. § 1983, an award of counsel fees in pursuance of 42 U.S.C. § 1988, and assorted other relief.

Each female plaintiff gave birth during late 1983 or 1984. The progeny in question (all of whom were born in Rhode Island) and their respective dates of birth, are as follows:

1. Jonathan M. Paquette: December 9, 1983
2. Joshua T. Gardiner: April 17, 1984
3. Elizabeth C. Godoy: September 11, 1984
4. Evan A. Bessette: September 11, 1984
5. Kristin A. Mycroft: October 27, 1984
6. Sarah deLeiris: October 27, 1984

There are four defendants: the state of Rhode Island and a trio of state officials (the director of health, the registrar of vital statistics, and the attorney general). Inasmuch as all of the individual defendants have been sued only in their official capacities, the court will from time to time refer to the defendants in the aggregate as "the state." Jurisdiction is premised on the existence of federal questions. 28 U.S.C. §§ 1331, 1343.

In the fall of 1985 and thereafter, the court held a number of conferences with counsel. As a result of agreements reached during those sessions, the court entered an order on December 4, 1985 bifurcating the issues, so that liability would be addressed first and the questions of class certification, damages, classwide relief, and the like would be reserved to a later date. With the concurrence of all parties, the court undertook to decide the liability phase, including the constitutional issues which had been raised, on a stipulated record as a case stated under Fed.R. Civ.P. 52(a). A briefing schedule was established and thereafter enlarged by a supplemental order entered on March 12, 1986. Compendious briefs have been filed by the parties and oral argument was entertained on June 16, 1986. Decision was reserved.

## I.

As the essential facts are not in dispute, they are susceptible of succinct summarization. This litigation had its origins in cer-tain administrative sequellae to the birth of the plaintiffs' children. Shortly after each happy event, the newborn's parents received a live birth worksheet (Worksheet) from the state department of health (Department). The top portion of the Worksheet (the propriety of which the plaintiffs do not challenge) required the parents to supply the child's name and sex, the date, time and location of birth, and the parents' names, ages, and addresses. All of the plaintiffs, however, refused to complete the lower portion of the Worksheet. Labelled "information for medical and health use only," that segment of the Worksheet sought to ferret out the following information:

a. race of mother;
b. race of father;
c. highest grade of education completed by father;
d. how many other children born alive are now living;
e. how many other children born alive are now dead;
f. date of last live birth;
g. number born dead before 20 weeks gestation (miscarriages, stillbirths, or abortions);
h. number born dead after 20 weeks gestation (miscarriages, stillbirths, or abortions);
i. date of last miscarriage, stillbirth, or abortion;
j. date last menstrual period began;
k. month in which pregnancy prenatal care began;
l. number of prenatal visits;
m. highest grade of education completed by mother;
n. birth weight of child;
o. marital status of mother at conception and/or delivery.

The Worksheet has been in continuous use in the state for more than fifteen years. It is patterned after the sample live birth worksheet issued by the National Center for Health Statistics of the United States Department of Health and Human

Services as a guideline for implementing birth registration systems in the United States. Nevertheless, the plaintiffs regarded it as an impermissible intrusion into essentially private matters; they contend that the state's nose cannot be poked into the delivery room, and into the parents' lives, with such impunity.

After the plaintiffs refused to complete the confidential (lower) portion of the Worksheet, they each received a letter from defendant Martin, acting in his capacity as the state's registrar of vital statistics (Registrar).[1] This first letter stated in part:

> The information on this form is required to be entered on the birth certificate by Rhode Island law. Your child's birth certificate will not be acceptable for registration until all the missing items have been completed, or until their omission has been satisfactorily accounted for.

The letter also described the supposed importance of the informational request and the confidentiality which presumably attached to data supplied in response to the inquiries posed in the bottom portion of the Worksheet. The mailed fist was not completely sheathed, however, as the Registrar's missive went on to observe that:

> If you return the completed form ..., the birth certificate can then be registered. If you do not wish to complete any or all the items, please inform me in writing of your reasons for refusing the information. Upon receipt, your statement will be reviewed and, if it satisfactorily accounts for the omission of the items, the birth certificate can then be registered. If your statement does not satisfactorily account for the omission of the items, you will be notified by registered mail within 10 calendar days....

The parties agree that, during the period at issue, this sort of letter was used as a matter of course to notify parents that their Worksheets were incomplete. (Although the plaintiffs all received such correspondence, it was by no means limited to them; from October 1984 through February 1985, for example, approximately thirty such letters were posted to different sets of parents.) The initial letter plainly implied that, if the information was not furnished (or its absence "satisfactorily account[ed] for"), the child's birth would not be registered, that is, no birth certificate would issue.

The stipulated record also includes a second letter to Closter-Godoy, dated October 29, 1984, which the parties acknowledge is representative of the follow-on letter sent to parents who, after receipt of the Registrar's first billet-doux, persisted in their refusal to complete the form. The second letter indicated that the information was to be used for "public health statistical purposes" and kept "strictly confidential," and that "[t]he data on marital status has legal significance," in accordance with a specified state statute. Indeed, this missive purported to quote chapter and verse in setting forth the legal bases upon which the Registrar's demand was premised. The penultimate paragraph of this letter was virtually identical to that contained in the prototypical first letter, quoted at length *ante.* The implied threat (of nonregistration) was likewise a constant. The damoclean sword was visibly poised.

The bullying tone of this correspondence notwithstanding, the Registrar did not succeed in extracting the desired information from five of the six couples who appear as plaintiffs herein. Only Deborah Mycroft capitulated to Martin's demands; she completed the Worksheet, assuming that her child would not receive a birth certificate otherwise. Yet, the Registrar was playing a particularly devious game: despite his pious insistence that birth certificates would not be entered absent prior receipt of the desired personal data, Martin nevertheless recorded the certificates surreptitiously, that is, without notifying the par-

---

1. The parties have agreed that the letters sent to Susan Closter-Godoy on October 2, 1984 and to Betsy and Daniel deLeiris on November 16, 1984 were representative of the initial letters routinely sent by the Registrar to all parents who neglected or refused to complete the entire Worksheet.

ents. As the parties have stipulated, "[i]t was the continuing practice of the Registrar to record the certificates of Live Birth with or without regard to the response to the letters by the parents involved."

Martin ceased the practice of issuing written demands for completion of Worksheets at about the time this suit was brought. And in May 1985, the governing legislation was amended to make it perfectly plain that the Registrar had no authority to decline to register a birth certificate simply because the parents refused to complete the lower portion of the Worksheet or to supply equivalent information. *See* R.I. Gen.Laws § 23–3–10(f) (1985), discussed *post* Part II.

## II.

In order to place this controversy into sharper focus, it is necessary to grasp the intricacies of Rhode Island's statutory format for recordation of live births and kindred data. This format, known as the Rhode Island Vital Statistics Act (RIVSA), was originally enacted in 1961. R.I.Pub. Laws 1961, Ch. 87, § 1. It was amended betimes thereafter, and is presently codified as R.I.Gen.Laws §§ 23–3–1 to 23–3–28. (Except where otherwise expressly indicated, all references to the RIVSA in this rescript implicate the statute as it was framed prior to the May 1, 1985 amendment.)

The linchpin of the RIVSA is the establishment in the Department of a separate division of vital statistics (Division). R.I. Gen.Laws § 23–3–2. The Division's mission under the RIVSA is to "install, maintain, and operate the system of vital statistics throughout [the] state," R.I.Gen.Laws § 23–3–2, and its functional responsibilities include the proper registration, statewide, of birth certificates. The Registrar is the official charged with carrying out the Act's provisions and the Division's charge. *Id.* at § 23–3–4. Primary responsibility for directing and supervising the state's system

of vital statistics rests in his domain. *Id.* at § 23–3–5(a)(2). He is obliged to enforce the commands of the RIVSA and the rules and regulations promulgated thereunder. *Id.* at § 23–3–5(a)(1). The Registrar's duties include "[p]rescrib[ing], with approval of the state director of health, ... such forms as are required by [the Act] and the rules and regulations issued [under the Act]." *Id.* at § 23–3–5(a)(4). The director (Director) of the Department appoints the Registrar, *id.* at § 23–3–4, and is his immediate superior.

The instant litigation casts a spotlight upon certain other provisions of the RIVSA as well. R.I.Gen.Laws § 23–3–10(a), which authorizes the collection of birth information, provides in part that "[a] certificate of birth ... shall be filed ... within four (4) days after such birth and shall be registered ... if it has been completed and filed in accordance with this section." The RIVSA also requires that all such certificates "include as a minimum the items recommended by the federal agency responsible for national vital statistics subject to approval of and modification by the state director of health." *Id.* at § 23–3–9(a).[2]

The RIVSA does not explicitly create a parental duty to complete the Worksheet. While the statute states that "[e]ither of the parents shall sign the certificate of live birth to attest to the accuracy of the personal data entered thereon....," § 23–3–10(e), no provision mandates that they complete the Worksheet in full. Likewise, R.I. Gen.Laws § 23–3–27, which requires any "person having knowledge" to furnish, upon the Registrar's summons, "such information as he may possess regarding any birth, death, fetal death, marriage, or divorce" plainly falls far short of a command in respect to the type and kind of information called for by the balance of the Worksheet. Nevertheless, a regulation which supplements the RIVSA goes well beyond the requirements of the statute in this re-

**2.** The federal agency to which § 23–3–9(a) refers is the National Center for Health Statistics, a division of the United States Department of Health and Human Services. *See* 42 U.S.C. § 242k(a) (1982).

spect. The regulation, promulgated prior to commencement of this litigation but subsequent to the occurrence of some of the events in this case, directed "[t]he state and local registrar only [to] accept a certificate ... if ... [i]t includes all the information requested on the form or satisfactorily accounts for any omission." Regulation 6.2(g). Although the regulation on its face purported only to bind the registrars, it is clear from Martin's letters to the parents that the administrators of the Division construed the regulation to impose an affirmative duty on the parents of newborns.[3] To all appearances, Regulation 6.2(g) remains on the books of the Department; at the least, no party to this litigation has pointed to any evidence of its amendment or repeal, and the court's independent research has been similarly unavailing.

Once information is in the hands of the Registrar, the subject of disclosure is controlled by R.I.Gen.Laws § 23–3–23, which declares in part that:

(a) To protect the integrity of vital statistics records, to insure their proper use, and to insure the efficient and proper administration of the vital statistics system, it shall be unlawful for any person to permit inspection of or to disclose information contained in vital statistics records, ... except as authorized by regulation.

The statute further provides, however, that the Director "may authorize under appropriate safeguards the disclosure of data contained in vital statistics records for research purposes." *Id.* at § 23–3–23(b).

Criminal penalties may accompany noncompliance with the RIVSA. For instance:

Any person who refuses to provide information required by this chapter ... or ... who willfully neglects or violates any of the provisions of this chapter ... shall be punished by a fine of not less than twenty-five dollars ($25.00) nor more than one hundred dollars ($100.00) or be imprisoned for not more than thirty (30) days or by both such fine and imprisonment. ·

R.I.Gen.Laws § 23–3–28(b).

The last piece of the statutory mosaic which must be singled out for special comment at this time is the amendment enacted by the Rhode Island General Assembly effective May 1, 1985, R.I.Pub.Laws 1985, ch. 459, § 1 (now codified at R.I.Gen.Laws § 23–3–10(f) ), which reads as follows:

Neither the state registrar, nor any local official shall decline to register and/or issue any birth certificate or certified copy thereof on the grounds that medical or health information collected for statistical purposes has not been supplied.

The plaintiffs do not challenge the validity of the 1985 law. They concede that this amendment is prophylactic in nature and that it cures one of the infirmities of which they initially complained. There is no contention that Martin, from and after the enactment of § 23–3–10(f), has persisted in threatening nonregistration of live births as a lever to force parents to supply confidential data of the type and kind limned in the bottom segment of the Worksheet. From aught that appears of record, completion of the Worksheet in its entirety is now an. altogether voluntary matter. It is still in use and is still distributed to fledgling parents, but the state does not insist that the lower portion be completed. As the parties have stipulated, after February 1985, the Registrar no longer made "written demands for the additional information [if] a parent took issue" with the request. There is nothing to indicate that oral solici-

---

**3.** The Supreme Court has noted:

When the construction of an administrative regulation ... is in issue, deference [to the officers or the agency] is ... clearly in order. "Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) ) (footnote omitted).

tation occurs or that pressure of any kind is applied. And, insofar as this record reveals, the state neither imposes nor threatens any penalties for failure to furnish the data.

### III.

To place the conduct of Martin and of the Registrar's office in proper perspective, a short digression is in order. The record in this case is replete with references to an earlier case filed in this court in mid-1983, viz., *Frances Coulter et al. v. Joseph E. Cannon, M.D., et al.*, C.A. No. 83-0301 S. Briefly stated, Mr. and Mrs. Coulter, proud parents of a newborn, declined to complete the lower segment of the live birth worksheet. The then-Registrar declined to record the birth for that reason. The Coulters sued, seeking declaratory and injunctive relief, money damages, and the like. No request was made to certify a class. The defendants were the predecessors in office of the present defendants: the Director, the Registrar, and the state's attorney general.

*Coulter* was settled by the entry of a consent decree on August 29, 1983. Despite arguments made from time to time during the early stages of this litigation, the parties are now in seeming agreement that no res judicata effect attaches under or in consequence of the *Coulter* decree. The sole relevance of the earlier litigation is the admission therein that

> Defendants admit R.I.G.L. § 23-3-9 does not authorize the [state] to compel production of confidential health care information by withholding Certificates of Birth Registration.

*Coulter v. Cannon,* C.A. No. 83-0301 S, Judgment Stipulation at § 1(a) (D.R.I. Aug. 29, 1983).

### IV.

The plaintiffs in this case have mounted a challenge to the constitutionality of the criminal penalties imposed by R.I.Gen. Laws § 23-3-28(b); they seek a declaration that the statute, if it can reasonably be construed to reach those in the plaintiffs' position, is fatally overbroad, and they ask for the issuance of a restraining order permanently barring the state attorney general from instituting criminal proceedings against them for their recalcitrance in respect to completion of the Worksheets. Secondly, they ask the court to brand R.I. Gen.Laws § 23-3-9 and the regulations enacted pursuant thereto repugnant to the federal Constitution, at least in the manner in which the statutory scheme has historically been applied by the Registrar. Lastly, the plaintiffs seek to recover compensatory damages under 42 U.S.C. § 1983 for what they view as the unlawful conduct of the defendants, damages designed to compensate them for the perceived transgressions of their rights and liberties.[4] In all three aspects, of course, the plaintiffs look to the availability of counsel fees, 42 U.S.C. § 1988, and other ancillary redress.

The court will address these asseverations seriatim.

### A. CRIMINAL SANCTIONS

Insofar as the third amended complaint challenges the penalty component of the RIVSA, it zeroes in on those provisions of the Act which punish by fine and/or imprisonment "[a]ny person who refuses to provide information required by this chapter," R.I.Gen.Laws § 23-3-28(b)(2), and "[a]ny person who willfully neglects or violates any of the provisions of this chapter or refuses to perform any of the duties imposed upon him by this chapter." *Id.* at § 23-3-28(b)(3). Specifically, the complaint

---

**4.** As noted earlier, *see ante* at 1554, the defendants are sued only in their official capacities. A suit against a state officer in his representative status must be viewed as a suit against the state itself. *See Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1052, 10 L.Ed.2d 191 (1963); *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). The plaintiffs have not prayed for an award of punitive damages, and the state (hence, these "official capacity" defendants) would not be liable for any such. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258-71, 101 S.Ct. 2748, 2755-62, 69 L.Ed.2d 616 (1981). Accordingly, no further consideration can or will be given to the subject of exemplary damages.

seeks two types of relief: a declaration that § 23–3–28(b)(3) violates the Due Process Clause of the fourteen amendment because it sweeps in an unduly vague and overbroad manner, and a permanent injunction against enforcement of § 28–3–28(b)(2).

Before passing on requests for declaratory and injunctive relief against the operation of state law, this court must first acknowledge the constitutional restraints which confine its jurisdiction. Article III, § 2 mandates that only actual cases and controversies may be decided. *Sosna v. Iowa,* 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–559, 42 L.Ed.2d 532 (1975); *Muskrat v. United States,* 219 U.S. 346, 361, 31 S.Ct. 250, 255, 55 L.Ed. 246 (1911); *Berkshire Cablevision of Rhode Island, Inc. v. Burke,* 773 F.2d 382, 384 (1st Cir.1985); *Shell Oil Co. v. Noel,* 608 F.2d 208, 212–13 (1st Cir.1979). As the Supreme Court has indicated:

> The various doctrines of "standing," "ripeness," and "mootness" ... are but several manifestations ... of the primary conception that federal judicial power is to be exercised to strike down legislation ... only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action.

*Poe v. Ullman,* 367 U.S. 497, 503–04, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989 (1961) (plurality opinion) (footnotes and citations omitted). Thus, the Court has held:

> The party who invokes the power [to annul legislation on grounds of its unconstitutionality] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement....

*Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *see*

*also Poe,* 367 U.S. at 504–05, 81 S.Ct. at 1756.

These plaintiffs have failed to meet this burden of proof. While "it is not necessary that [the plaintiffs] expose [themselves] to actual arrest or prosecution," *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974), there must be some real possibility that the statute will be enforced and the plaintiffs prosecuted. Paranoia alone is not enough. The instant action is clearly underripe, since the plaintiffs cannot genuinely "allege that they have been prosecuted or threatened with prosecution." *Bailey v. Patterson,* 369 U.S. 31, 32, 82 S.Ct. 549, 550, 7 L.Ed.2d 512 (1962). No gesture in this direction has been made. Indeed, the attorney general has shied away from prosecution of noncompliant parents as avidly as a misogamist avoids wedlock.

Given the lapse of time since the commission of the defiant acts, the utter absence of any state-sponsored effort to indict, charge, or otherwise prosecute any of the plaintiffs, the passage of the May 1985 amendment to the RIVSA, R.I.Gen.Laws § 23–3–10(f) (1985), and the attorney general's repeated protestations that prosecution has never been and is not now contemplated, the chances of prosecution seem to have dropped from slim to none. Whether viewed as a matter of "standing" or "ripeness" or "justiciability," it is plain that there is nothing here to adjudicate. It would be senseless to invoke the power of a federal court to enjoin state officials from undertaking a prosecution that they had no intention of maintaining in the first place.[5]

The fact that the plaintiffs have requested declaratory relief does not alter this court's conclusion that the challenge to § 23–3–28 is not ripe for review.

Although the requirements for issuance of a [declaratory] judgment ... are less

---

5. When pressed, plaintiffs' counsel acknowledged at oral argument that there was no current likelihood of prosecution and that Article III of the federal Constitution presented a towering obstacle to the quest for injunctive relief. That concession is not without significance;

points briefed but thereafter abandoned are customarily deemed to be waived. *United States v. Kobrosky,* 711 F.2d 449, 454 (1st Cir.1983); *Oaks v. District Court of State of Rhode Island,* 631 F.Supp. 538, 543 n. 4 (D.R.I.1986).

severe than the requirements for the issuance of an injunction based on the same claim, not even declaratory relief is available where the threat of state action is imaginary, speculative or chimerical. *Shell Oil,* 608 F.2d at 213 (citations omitted). Under the Declaratory Judgment Act, 28 U.S.C. § 2201, the federal courts only have "jurisdiction ... 'to adjudge the legal rights of litigants in actual controversies.'" *Golden v. Zwickler,* 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) (quoting *Liverpool, New York & Philadelphia Steamship Co. v. Commissioners of Emigration,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)) (emphasis omitted). No such actual controversy between the parties exists at this point in time, nor is there any plausible indication that one will eventuate in the future. Thus, it would be ultracrepedarian for this court to attempt to declare the rights of the state and certain of its citizens in what amounts to a purely hypothetical situation.

Inasmuch as there has been no showing of any cognizable danger that state action will be taken to prosecute these plaintiffs, this court declines to pass upon the constitutionality of the criminal penalties contained in R.I.Gen.Laws § 23-3-28. The plaintiffs' claims in this respect are dismissed without prejudice as unripened.

## B. CONSTITUTIONALITY OF STATE ACTIONS

The next string to the plaintiffs' bow addresses more directly the merits (or demerits, as the case may be) of the RIVSA. The plaintiffs envision the statutory scheme (as it existed prior to the May 1, 1985 amendment) and the regulations promulgated thereunder as invalid in several respects. First, the laws and regulations were, in the plaintiff's view, unconstitutional on their face. Secondly, the plaintiffs insist that, as applied by the Registrar, the official actions taken thereunder (i) invaded their privacy rights under the fourth amendment, (ii) countermanded their rights against self incrimination under the fifth amendment, and (iii) were so arbitrary

as to run afoul of the Due Process Clause of the fourteenth amendment. In addition to a declaration of rights, the plaintiffs envision the grant of broad-based injunctive relief prohibiting enforcement of any disclosure system, the award of compensatory damages, and with respect to the Mycroft plaintiffs (the only complaining couple to comply with the repeated requests for disclosure of personal information), expungement of the Registrar's records. In approaching these claims and prayers, however, the court is duty-bound first to ascertain the effect of the May 1985 amendment on this aspect of the litigation. As a matter of jurisdiction, the court can reach the substantive issues presented by the plaintiffs only if (and to the extent that) the controversy remains a zoetic one.

### 1. *Declaratory and Injunctive Relief: Mootness.*

An action is mooted, and thus does not meet the requirements of Article III of the federal Constitution, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (quoting *United States Parole Commission v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980)); *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). A federal court cannot decide a moot case because the tribunal's constitutional authority extends only to actual cases and controversies before it. *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); *Geraghty,* 445 U.S. at 395–96, 100 S.Ct. at 1208–09. (The doctrine of mootness is, of course, closely aligned with the doctrine of ripeness, discussed *ante* at Part IV A.)

It is not enough that a live controversy existed between the litigants when the action was instituted. "The rule in federal

cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Steffel*, 415 U.S. at 459 n. 10, 94 S.Ct. at 1216 n. 10. Circumstances often intervene to alter the posture of the litigation and to still a once-vibrant controversy between the parties. The Supreme Court has stated:

> [J]urisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted). *See also Berkshire Cablevision*, 773 F.2d at 384; *Loeterman v. Brookline*, 709 F.2d 116, 118 (1st Cir.1983).

When both of these conditions are satisfied, the case has become unactionable, in that neither party can pretend to have a (current) legally cognizable interest in the final determination of the underlying questions. *Davis*, 440 U.S. at 631, 99 S.Ct. at 1383; *Berkshire Cablevision*, 773 F.2d at 384. Thus, courts have often held that "the enactment of a superseding statute which satisfies all of the principles sought in an attack on the prior statute simply moots the case," *Johnson v. State*, 586 F.2d 387, 388 (5th Cir.1978), because the "amendment eliminate[s] or diminishe[s] the danger so as to render moot what had been a live controversy." *McCollester v. City of Keene*, 668 F.2d 617, 618 n. 3 (1st Cir.1982). *See, e.g., Boston Chapter, NAACP v. Beecher*, 716 F.2d 931, 932–33 (1st Cir.1983) (per curiam); *Wolfer v. Thaler*, 525 F.2d 977, 979 (5th Cir.1976); *Cox v. Stanton*, 529 F.2d 47, 49 & n. 1 (4th Cir. 1975); *Bowles v. Blue Lake Development Corp.*, 504 F.2d 1094, 1097–98 (5th Cir. 1974).

The facial challenge mounted by these plaintiffs addresses the mandatory disclosure system to which they were purportedly subjected. The heart of that scheme was the Registrar's threat, made pursuant to Regulation 6.2(g), that birth certificates would not be accepted for registration if the parents did not disclose all of the information requested on the Worksheet or satisfactorily account for any omissions. Any such mechanism for compelling disclosure—if it ever legally existed (a matter as to which no opinion need be expressed)— has been expressly eliminated by the passage of R.I.Gen.Laws § 23–3–10(f), which forbids the Registrar and local officials from declining to register birth certificates on the ground that medical or health information has not been supplied. Clearly, the new amendment conflicts directly with Regulation 6.2(g). Though the regulation has not formally been repealed, it is obviously a dead letter. As the court of appeals has noted, government officials cannot enforce a regulation which no longer comports with the statutory scheme:

> Since "a rule out of harmony with the statute, is a mere nullity," [one] cannot find refuge in a ... regulation that, while not officially rescinded, appears now to be totally at odds with current statutory law.

*Martinez v. Rhode Island Housing & Mortgage Finance Corp.*, 738 F.2d 21, 26 (1st Cir.1984) (quoting *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936)).

■ At the present time, as heretofore, neither the RIVSA nor its accompanying regulations place on the parents of newborns an affirmative duty to complete the live birth worksheet.[6] Thus, in the absence

---

6. The RIVSA only requires that one of the parents sign the certificate of live birth "to attest to the accuracy of the personal data entered thereon." R.I.Gen.Laws § 23–3–10(e). Essentially, that "personal data" comprises only the factual material with which the upper segment of the Worksheet is concerned. The only other (arguably) relevant statutory command is contained in R.I.Gen.Laws § 23–3–27, which ordains that "[a]ny person having knowledge of the facts shall furnish such information as he may possess regarding any birth, death, fetal death, marriage, or divorce, upon demand of the [Registrar]." It is impossible to read that statute so

of statutory or administrative provisions enabling the Registrar to withhold a birth certificate on the ground that the personal data has not been supplied, or providing some meaningful penalty for inattention to the Worksheet, no mandatory disclosure scheme exists at this moment. Under the constitutional principles enunciated above, the plaintiffs' claims for declaratory and injunctive relief have ceased to present a live controversy. Because the statute creates no affirmative duty to disclose data and because the state can no longer decline to register a birth on the basis that the Worksheet's lower section has been left blank (wholly or in part), there is no reasonable expectation that the plaintiffs will again be visited with official pressure to proffer intimate personal information.[7]

It does not matter that these parties couch their quest for a ruling in terms of a sought-after declaration of rights as opposed to a restraining order. The tenets of mootness apply with the same force to requests for declaratory judgment as they do to claims seeking injunctive relief. *Steffel*, 415 U.S. at 459, 468–74, 476, 94 S.Ct. at 1215, 1220–23, 1224; *Duffy v. Quattrocchi*, 576 F.Supp. 336, 340 (D.R.I.1983). "Basically, the question in each case is whether . . . there is a substantial controversy, be-

tween parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). *See also Golden*, 394 U.S. at 108, 89 S.Ct. at 959. Although the plaintiffs have raised intriguing questions of substantial public interest concerning the legality of a compulsory disclosure system, the federal courts are forbidden under Article III to render purely gratuitous opinions. *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971); *St. Pierre v. United States*, 319 U.S. 41, 42, 63 S.Ct. 910, 911, 87 L.Ed. 1199 (1943). Because no mandatory scheme is currently in place, any declaratory relief would at best operate in the abstract. And, as this court noted in *Duffy*, 576 F.Supp. at 342, the federal judiciary "cannot be placed in a position of issuing what would amount to advisory opinions whenever a citizen's curiosity has been piqued." *See also Shell Oil*, 608 F.2d at 213; *Donahue v. Rhode Island Department of Mental Health*, 632 F.Supp. 1456, 1471 n. 10 (D.R.I.1986). The plaintiffs' prayers for declaratory and injunctive relief are moot.[8]

---

broadly as to suggest that it requires the furnishing of the highly personal data anticipated by the bottom segment of the Worksheet—and the defendants do not suggest that § 23–3–27 can extend so far. The regulations (apart from Regulation 6.2, *see ante*), which outline in greater detail the duties of the state and local registrars, *see, e.g.*, Regulations 2.0, 3.0, place no additional burdens on the parents of newborns.

7. Admittedly, it is within the realm of possibility that the Registrar could invent an alternative method seeking to compel disclosure under the RIVSA. But, the court cannot play guessing games. The constitutionality of any such hypothetical scheme is not yet ripe for review because the anticipated events are too remote and uncertain. *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654, 689, 101 S.Ct. 2972, 2991, 69 L.Ed.2d 918 (1981); *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 304, 101 S.Ct. 2352, 2374, 69 L.Ed.2d 1 (1981). Moreover, these plaintiffs would not have standing to challenge a new system unless they were actually subjected to it. As the Supreme Court noted recently,

at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted).

8. As an aside, the court notes that the Registrar, after commencement of this litigation, decided to stop making demands for this type of information. *See* Stipulation ¶ 22. To be sure, this reform, in and of itself, does not necessarily moot the plaintiffs' claims. The Supreme Court has held that jurisdiction over an action may be retained despite the voluntary cessation of il-

## 2. *Liability for Damages.*

The denial of declaratory and injunctive relief, however, doe not end the matter. The plaintiffs' requests for compensation and for expungement of personal information from the records of the vital statistics registry are steeds of a different hue. The right to obtain monetary recompense for past misconduct plainly survives any changes in the regulatory scheme. The plaintiffs contend that they are entitled to recover damages for the crass manner in which the defendants trampled upon their privacy, and for the clumsy attempt to coerce the release of confidential information. If these assertions are well founded, then the state cannot escape liability for such wrongs simply by amending a statute, undercutting an administrative regulation, and promising to sin no more. These damage claims remain viable and are in order for adjudication. Similarly, Mycroft and her spouse retain a continuing interest in seeing that the data which she grudgingly submitted to the Registrar against her will is purged from the state's records.[9]

The Constitution provides at least two potential avenues for assault upon the defendants' actions under the RIVSA. First, it can cogently be argued that the Act and the regulations promulgated thereunder violated the plaintiffs' right to privacy, as guaranteed by the fourth amendment. Second, it can likewise be argued that the Registrar's policy of persistently requesting information from the parents under threat of withholding birth certificates, while nevertheless secretly recording the births, was so fundamentally unfair that it violated the essence of the Due Process Clause of the fourteenth amendment. Either theory, if resolved favorably to the claimants, would be dispositive of the liability issue. Prudential considerations dictate, however, that the court undertake to decide this case on the latter ground if it is possible to do so.

Abjuring adjudication of the privacy law question commends itself for several reasons. But, one will suffice. Following Justice Brandeis's admonition not to " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,' " *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia Steamship Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885) ), this court should refrain from passing on the invasion of privacy ground unless compelled to do so by the exigencies of the case as a whole. As framed, the invasion of privacy theory requires the court to examine the constitutionality of the Act itself, as it stood prior to the 1985 amendment—a far broader exercise than is contemplated on the due process ground (which requires only an examination of administrative practices) and one which, given the passage of R.I.Gen.Laws § 23–3–10(f) (1985), would have very limited precedential utility. Having in mind that many of the plaintiffs'

---

legal activity if the nisi prius court suspects that "the wrong [may] be repeated." *DeFunis v. Odegaard*, 416 U.S. 312, 318, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Defenders of Wildlife, Inc. v. Endangered Species Scientific Authority*, 725 F.2d 726, 731 (D.C.Cir.1984); *Boston Chapter, NAACP*, 716 F.2d at 932. But, there is no basis for any such suspicion here. To all appearances, the repentance is sincere and the lessons of the past have sunk in. The plaintiffs have been unable to show that "there exists some cognizable danger of recurrent violation...." *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 898. So, abandonment of the interdicted conduct by the Registrar bolsters the court's conclusion that the underlying claims for declaratory and injunctive relief are no longer live.

**9.** Though held in a state of semi-confidence, this personal data is still subject to disclosure in a variety of contexts, *e.g.*, when "authorized by [departmental] regulation," R.I.Gen.Laws. § 23–3–23(a), "under appropriate safeguards ... for research purposes," *id.* at § 23(b). If the data came into the Registrar's possession in an unlawful manner, Mycroft and any other persons similarly situated should not have to run the risk of republication, no matter how slight. (The defendants have made no claim that expungement is too costly or burdensome to be implemented in these circumstances.)

objections to the RIVSA have been remedied by the amendment of the Act, *see* text *ante,* and mindful, withal, that the law is in a state of flux in the privacy area, there is little point in venturing beyond the parameters of the due process challenge. After all, as the Supreme Court has observed in analogous circumstances, it is usually "inadvisable ... to reach out ... to pass on important questions ... when simpler, and more settled, grounds are available for deciding the case at hand." *Anderson v. United States,* 417 U.S. 211, 218, 94 S.Ct. 2253, 2259, 41 L.Ed.2d 20 (1974).

In this case, all considerations point to an early assessment of the conduct of the state's actors vis-a-vis these plaintiffs, deferring the fourth amendment challenge to the constitutionality of the RIVSA. The fact that the plaintiffs yearn to grapple with the broader privacy questions which they have argued cannot be allowed to tip the balance. Litigants have no vested right to invoke federal jurisdiction merely to dictate by which rationale they win. *Cf. Potomac Passengers Ass'n v. Chesapeake & Ohio Railway,* 520 F.2d 91, 97 (D.C.Cir. 1975). The court therefore turns to an assessment of the fourteenth amendment implications of the state's actions.

To limn the fourteenth amendment claim, it is important first to distinguish it from what it is not. This is not a claim that the Registrar should have eschewed any demand for such information—that would be the invasion of privacy claim. Nor is this a claim that Martin's procedures for obtaining the data, or for granting exemptions to parents who refused to comply with his requests, were inadequate. No such procedural due process claim is presented on the facts of this case. Likewise, the question of what procedures would protect parents who resisted a mandatory disclosure scheme is not raised here because, in fact, no mandatory scheme was actually implemented. Rather, the plaintiffs make the assertion that, *regardless* of the nature of

the RIVSA and the procedures used to implement it, Martin's actions were so fundamentally flawed that their due process rights were violated. Their attack on Martin's administration of the RIVSA sounds in substantive due process claim. Essentially, the Registrar is charged with having denied the parents' substantive due process rights by arbitrarily and capriciously leading them to believe that divulging their personal data was a prerequisite to the due recordation of their children's birth certificates.

The fourteenth amendment provides in pertinent part that: "No state shall ... deprive any person of life, liberty, or property without due process of law." Unlike the procedural due process area, where the caselaw has firmly established the principle that the plaintiff must show a clear entitlement to liberty or property, *see Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), the Court's decisions in the substantive due process area have been less explicit. The Court has intimated, however, that as in the arena of procedural due process, the right to substantive due process inheres only if state action impairs an individual's liberty or property interests. *E.g., Regents of The University of Michigan v. Ewing,* —— U.S. ——, 106 S.Ct. 507, 512, 88 L.Ed.2d 523 (1985). The majority of the circuits that have considered the question, following Judge (now Justice) Stevens's lead in *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1, 3–5 (7th Cir.1974),[10] have concluded that the absence of a property or liberty interest is fatal to a substantive due process claim. *See, e.g., Clark v. Whiting,* 607 F.2d 634, 641–42 n. 17 (4th Cir.1979); *Sullivan v. Brown,* 544 F.2d 279, 282 (6th Cir.1976); *Weathers v. West Yuma County School District R–J–1,* 530 F.2d 1335, 1340–41 (10th Cir.1976); *Buhr v. Buffalo Public School District No. 38,* 509 F.2d 1196,

---

**10.** *Jeffries* rejected the notion that a citizen has a substantive right to be absolutely free from all arbitrary and capricious governmental action, because otherwise "every time a citizen was affected by governmental action, he would have a federal right to judicial review." *Jeffries,* 492 F.2d at 4 n. 8.

1202–03 (8th Cir.1974). *See also Perkins v. Board of Directors of School Administrative District No. 13,* 686 F.2d 49, 51 n. 5 (1st Cir.1982) ("plaintiff's [substantive due process] claim would fail on our determination that she had no constitutionally protected property right"). Thus, the initial inquiry on this topic is the presence vel non of a cognizable liberty or property interest on the plaintiffs' part.

While the Supreme Court has insisted that property interests must "stem from an independent source such as state law," *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709, it has held that "[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). *See also Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–40, 49 L.Ed.2d 451 (1976). The Court has taken a consistently expansive view of what comprises "liberty." In *Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), the Court remarked:

> Although the Court has not assumed to define "liberty" with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective.

*Roth,* while narrowing the definition of property interests, *see* 408 U.S. at 577, 92 S.Ct. at 2709, painted the definition of liberty with broadly brushed strokes:

> "While this Court has not attempted to define with exactness the liberty ... guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 U.S. 309, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042]. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. *See, e.g. Bolling v. Sharpe,* 347 U.S. 497, 499–500 [74 S.Ct. 693, 694, 98 L.Ed. 884]; *Stanley v. Illinois,* 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)].

408 U.S. at 572, 92 S.Ct. at 2706.

So, too, the plurality opinion in *Moore v. East Cleveland,* 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977), quoting Justice Harlan's dissent in *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776–77, 6 L.Ed.2d 989 (1961), described liberty as

> a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

Such spacious definitions of liberty surely encompass an individual's interest in retaining highly personal information free from unwarranted governmental intrusion, coercion, and deception so long as he or she so chooses. Likewise, liberty must embody the freedom to make important personal decisions with foreknowledge of the full legal consequences of one's acts. Little could be clearer than that each of these plaintiffs possessed a virtually classic liberty interest in being accurately apprised of whether his or her decision to divulge intimate personal data to the government would have an effect on the ability to secure a birth certificate for the child in question. The character of the interest can only be heightened when one considers the vital nature of a birth certificate in modern times: without that slip of paper, a person's identity and legitimacy are at risk in

a variety of aspects. In one way or another, the right to vote, the right to enroll in public schools, the right to participate in certain social programs, the right to travel internationally, are all dependent on the production of a birth certificate. A parent might well believe that a child whose birth was not "officially" recorded would go through life as a faceless nonperson, substantially disadvantaged in terms of access to educational opportunities, employment, government programs, and the like.

This liberty interest is clearly " 'essential to the orderly pursuit of happiness by free [people].' " *Roth,* 408 U.S. at 572, 92 S.Ct. at 2707 (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed.2d 1042 (1923)). Without this interest in being free from the affirmative misrepresentations of government officials, individuals would be unable to make basic decisions about governing their lives. If liberty " 'includes a freedom from all substantial arbitrary impositions,' " *Moore,* 431 U.S. at 502, 97 S.Ct. at 1937, (quoting *Poe,* 367 U.S. at 543, 81 S.Ct. at 1777 (Harlan, J., dissenting)), it must surely include a freedom from unfairly coercive government behavior of the sort practiced here.[11] Moloch must sometimes be tolerated in the public interest, say, in a state of national emergency. But when Moloch speaks to the citizenry with forked tounge, government goes too far.

Moreover, as the First Circuit has pointed out, liberty cannot be limited to fundamental freedoms, such as those enumerated in the Bill of Rights:

"[L]iberty" seems to us an incomplete protection if it encompasses only the right to do momentous acts, leaving the state free to interfere with those personal aspects of our lives which have no direct bearing on the ability of others to enjoy their liberty.

*Richards v. Thurston,* 424 F.2d 1281, 1284–85 (1st Cir.1970). By necessary implication, liberty also consists of "the freedom to make and act on less significant personal decisions without arbitrary government interference." *Dwen v. Barry,* 483 F.2d 1126, 1130 (2d Cir.1973). Certainly the decision to disclose information of the nature requested on the Worksheet is one that a citizen should be able to make unobstructed by an official's affirmative misrepresentations.

Inasmuch as these plaintiffs plainly possessed identifiable liberty interests, the court must determine whether Martin deprived them of their substantive due process rights. To be sure, substantive due process ranks among the most elusive of constitutional doctrines. *See Moore,* 431 U.S. at 502, 97 S.Ct. at 1937 ("Substantive due process has at times been a treacherous field for this Court.... [Its] history counsels caution and restraint. But it does not counsel abandonment...."). The concept remains, nevertheless, a viable one.

---

**11.** In many respects, this liberty interest is akin to certain privacy interests. While it is clearly distinct from the privacy interests implicated by contraception, *see Griswold v. Connecticut,* 381 U.S. 479, 481–86, 85 S.Ct. 1678, 1679–83, 14 L.Ed.2d 510 (1965), or abortion, *see Roe v. Wade,* 410 U.S. 113, 152–64, 93 S.Ct. 705, 726–32, 35 L.Ed.2d 147 (1973), it is similar to what the Court has described as the "individual interest in avoiding disclosure of personal matters," *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (footnote omitted), or the " 'right ... to be let alone.' " *Union Pacific Railway v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) (quoting Cooley on Torts at 29). *See also Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) ("[The framers of our Constitution] conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."). Almost a century ago the Supreme Court emphasized the significance of this right:

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Union Pacific Railway,* 141 U.S. at 251, 11 S.Ct. at 1001. If individuals have the right to possess and control their own persons, they are entitled, in the absence of some compelling state interest, to regulate (or, for that matter, to abjure) the disclosure of personal information, and to have full and accurate knowledge of the legal ramifications of their actions.

And, it is peculiarly apposite to the star-crossed facts of this case.

Unlike procedural due process, which conditions government deprivation of an individual's liberty or property upon provision of adequate procedural remediation, *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (describing factors to be balanced in determining what process is due), "substantive due process imposes limits on what a state may do regardless of what [procedural] process is provided." *Madden v. City of Meriden*, 602 F.Supp. 1160, 1166 (D.Conn. 1985). As the First Circuit has recently noted, "the very concept of a violation of substantive due process is that the conduct complained of is impermissible *per se.*" *Fernandez v. Leonard*, 784 F.2d 1209, 1216 (1st Cir.1986). Simply put, "there are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process." *Parratt v. Taylor*, 451 U.S. 527, 545, 101 S.Ct. 1908, 1918, 68 L.Ed.2d 420 (1981) (Blackmun, J., concurring) (citations omitted). *See also Rutherford v. City of Berkeley*, 780 F.2d 1444, 1447 (9th Cir. 1986) ("Where the denial is of substantive ... due process, the governmental conduct involved would remain unjustified even if there existed the most stringent of procedural safeguards."); *Casines v. Murchek*, 766 F.2d 1494, 1502 (11th Cir.1985) (a substantive due process claim is stated where it is clear that "rights are violated no matter what process precedes, accompanies, or follows the unconstitutional action") (quoting *Augustine v. Doe*, 740 F.2d 322, 327 (5th Cir.1984)).

In determining whether a particular type of official conduct is impermissible per se, the court must look to the values underlying the fourteenth amendment. While " 'due process' has never been, and perhaps can never be, precisely defined [,] ... the phrase expresses the requirement of 'fundamental fairness.' " *Lassiter v. Department of Social Services of Durham County, North Carolina*, 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981). To ensure fundamental fairness, the Supreme Court has consistently checked the "attempts of executives ... to disregard the deep-rooted demands of fair play enshrined in the Constitution." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). As Justice Frankfurter observed, the Court " 'has never held ... that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in "due process of law" as understood at the time of the adoption of the Constitution.' " *Id.* at 161–62, 71 S.Ct. at 643 (quoting *The Japanese Immigrant Case*, 189 U.S. 86, 100, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903)).

The Court has peered further, to the historical perspectives on due process itself, in order to discern its doctrinal parameters. "Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society.' " *Moore*, 431 U.S. at 503, 97 S.Ct. at 1937, (quoting *Griswold*, 381 U.S. at 501, 85 S.Ct. at 1691) (Harlan, J., concurring)) (footnotes omitted). Thus Justice Frankfurter stated:

> Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, "due process" cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness ... between the individual and government, "due process" is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess.

*Joint Anti-Fascist Refugee Committee*, 341 U.S. at 162–63, 71 S.Ct. at 643–44 (Frankfurter, J., concurring). *See also Moore*, 431 U.S. at 501, 97 S.Ct. at 1936;

*Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).

Although the Court has trimmed its sails in the substantive due process area since the New Deal era, *see, e.g., Ferguson v. Skrupa,* 372 U.S. 726, 730–32, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 486–88, 75 S.Ct. 461, 463–65, 99 L.Ed. 563 (1955); *United States v. Carolene Products Co.,* 304 U.S. 144, 147–51, 58 S.Ct. 778, 780–83, 82 L.Ed. 1234 (1938), the doctrine is often utilized (with excellent reason) to curb unwarranted government intrusion into privacy and to punish the use of excessive government coercion or force. The latter application of substantive due process was first formulated in *Rochin,* where the Court held that the forcible nonconsensual extraction of the stomach contents of a criminal defendant violated his due process rights. *Rochin,* 342 U.S. at 172–74, 72 S.Ct. at 209–11. Although only later recognized as a substantive due process decision, *see Fernandez,* 784 F.2d at 1215; *Johnson v. Glick,* 481 F.2d 1028, 1030–33 (2d Cir. 1973), *Rochin* established the principle that "conduct that shocks the conscience" is inherently violative of due process. *Rochin,* 342 U.S. at 172, 72 S.Ct. at 209. Thus, the state may not act in a manner that fails to "respect certain decencies of civilized conduct" or one which "offend[s] the community's sense of fair play and decency." *Id.* at 173, 72 S.Ct. at 2100. *See also Fuentes v. Moran,* 733 F.2d 176, 181–82 (1st Cir.1984).

Despite the paucity of substantive due process cases outside the privacy and excessive force contexts, the doctrine has been utilized from time to time to attack intentional acts which spring mindlessly from the brow of government. The Supreme Court continues to condemn "arbitrary and irrational" legislation. *See, e.g., PBGC v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 14–20, 96 S.Ct. 2882, 2891–95, 49 L.Ed.2d 752 (1976); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 650, 94 S.Ct. 791, 801, 39 L.Ed.2d 52

(1974). In *LaFleur,* for example, the Court struck down irrebutable presumptions that pregnant women were incapable of continuing with their teaching because such presumptions were arbitrary and irrational. *Id.* at 643–50, 94 S.Ct. at 797–801.

Other Supreme Court cases, while rejecting the particular substantive due process claims raised, have intimated that arbitrary state action would unhesitatingly be vitiated in (un)suitable circumstances. *See, e.g., Ewing,* 106 S.Ct. at 512–15; *Harrah Independent School District v. Martin,* 440 U.S. 194, 198–200, 99 S.Ct. 1062, 1064–65, 59 L.Ed.2d 248 (1979). Just this year, in *Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (citations omitted) the Court emphasized:

> [T]he Due Process Clause ... was " 'intended to secure the individual from the arbitrary exercise of the powers of government.' " ... [B]y barring certain government actions regardless of the fairness of the procedures used to implement them, *e.g., Rochin,* ... it serves to prevent governmental power from being "used for purposes of oppression."

It is beyond peradventure, then, that the Supreme Court would strike down official conduct which has sunk to subterranean depths. The First Circuit has signalled that it, too, will not hesitate to act against "gross abuse of power, invidious discrimination, or fundamentally unfair procedures." *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 832 n. 9 (1st Cir. 1982). This court finds that Martin's actions are of this magnitude. Not only did he act arbitrarily; worse, he used his governmental power in a manner that must be classified as vulpine and oppressive. He acted purposefully to mislead and to deceive new parents into thinking that he possessed—and would exercise—powers that he knew he did not have, and he employed that studied duplicity to force access to the storerooms of the parents' minds so that the state might collect the private tidbits hidden there. His were the tools of a tyrant, not those of an official appointed under a democratic government.

In a very real sense, substantive due process is like a dare line drawn in the dust by a bully: when, as, and if society permits it to be crossed with impunity, then everything is placed at risk. The manner in which these plaintiffs were treated, while not physically intrusive, traumatizes the conscience of this court. And, in certain respects, it exceeds the bounds of civilized conduct in an even more profound fashion than the excessive police brutality condemned by *Rochin* and its progeny. The coercive extraction of intimate personal details from a woman of childbearing age by artifice practiced by an executive clothed in the regalia of state power seems, if anything, more contemptible than the forcible use of a stomach pump by law enforcement officers. Martin's efforts to dislodge personal information from the plaintiffs by misrepresenting the significance of the data and its relationship to the issuance of birth certificates constituted a deliberate and concerted effort to dupe the citizenry. Its effrontery was underscored by the fact that the Registrar was bound ʰy the earlier *Coulter* admission, *see ante* Part III, and knew beyond any doubt that he could not withhold birth certificates as a means of compelling the production of confidential health care information.

This scheme, devised and enacted by a high ranking official, was executed no less than thirty times. That it had little apparent success is scant consolation. In contrast to a police officer's use of excessive force (which is extremely harmful, but harmful only in a particular case), Martin's evil plan to misrepresent official policy on a consistent and repeated basis threatened the very soul of a democratic society.

The court believes that this case presents a course of official conduct which far exceeds the sort of arbitrariness that citizens may occasionally be forced to suffer legitimately at the hands of government agencies. We are dealing here with a phenomenon far more insidious than the irritating, but inevitable, garden variety bureaucratic fallout which is part of the price we pay for government—and which is not cognizable under the Due Process Clause. *See, e.g., Creative Environments,* 680 F.2d at 831–34 (rejecting plaintiff's challenge to treatment by zoning board); *Moran v. Bench,* 353 F.2d 193, 194 (1st Cir.1965) (rejecting plaintiff's challenge to treatment by registry of motor vehicles). The type of unfettered discretion invidiously exercised by Martin in these circumstances is of a different, more sinister genre. It violated the fundamental values protected by the Due Process Clause. The telling of the tale offends rudimentary notions of what should constitute fair play by an enlightened government in modern society. The Fifth Circuit has appropriately noted:

> The public has the right to expect its officers to observe prescribed standards and to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse.

*Hornsby v. Allen,* 326 F.2d 605, 610 (5th Cir.1964). As one district court has declared, "due process requires that we be ruled by law and not by fiat." *Baker-Chaput v. Cammett,* 406 F.Supp. 1134, 1140 (D.N.H.1976) (citing *Wisconsin v. Constantineau,* 400 U.S. 433, 436, 91 S.Ct. 507, 509, 27 L.Ed.2d 515 (1971)). If those words are to be more than an empty expression of hope, then the triumph of law over fiat demands that the state be held accountable for the iniquities which this blemished record so starkly reveals.[12]

---

**12.** The state has not asserted that it is immune from suit in federal court under the eleventh amendment. Even if the defendants had argued such a defense, Rhode Island clearly waived its eleventh amendment immunity for wrongs that are tortious in nature by passing R.I.Gen.Laws § 9–31–1 (1985). *See Della Grotta v. State of Rhode Island,* 781 F.2d 343, 346–47 (1st Cir. 1986); *Laird v. Chrysler Corp.,* 460 A.2d 425, 430 (R.I.1983). *See also Healey v. Bendick,* 628 F.Supp. 681, 694 (D.R.I.1986); *Allendale Leasing, Inc. v. Stone,* 614 F.Supp. 1440, 1451 (D.R.I. 1985), *aff'd,* 788 F.2d 830 (1st Cir.1986).

The defendants' actions in this case are sufficiently akin to torts cognizable under state law to fall comfortably within the § 9–31–1 waiver. "An action for deceit sounds in tort and requires

The court holds that, under the circumstances, the conduct of the defendant Martin deprived the plaintiffs of substantive due process; that the information euchred out of Mycroft must be expunged from the state's records; and that Martin *qua* Registrar, and therefore the state, is liable to respond in damages to the plaintiffs. Since Martin, like all of the other individual defendants, has been sued only in his official capacity, *see ante* n. 4, the state is liable for the damages, fees and costs owed to the plaintiffs. *See Hawaii v. Gordon*, 373 U.S. at 58, 83 S.Ct. at 1053 ("relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter"). Because the state (and only the state) would be bound regardless of whether the other officials named in the suit were found to have violated the plaintiffs' constitutional rights, this court need not address the liability of the other defendants.

## V.

To summarize briefly, the court concludes that the plaintiffs' challenge to certain criminal provisions contained within the RIVSA is not ripe for review inasmuch as there is no serious threat that any prosecution will be undertaken. The "dangers" of which the plaintiffs complain are purely theoretical—considerably more illusory than real.

With respect to the other prongs of the plaintiffs' attack, the court holds that the requests for injunctive and declaratory relief have been mooted by the May 1985 amendment to the RIVSA (which has effectively prevented the defendants from imposing a mandatory disclosure condition even if they currently wished to do so), and by the defendants' voluntary cessation of the interdicted conduct. Judicial intervention is unwarranted, as whatever constitutional infirmities may have existed have been legislatively cured. The situation has been fully ameliorated by the occurrence of interim events.

The requests for compensatory relief and for the expungement of personal information from the state's records remain viable. To this end, the court eschews a decision on the invasion of privacy ground, but holds that defendant Martin violated the plaintiffs' substantive due process rights by arbitrarily and capriciously deceiving the parents about the legal ramifications of the personal data sought on the Worksheet and gaining information to which the state was not legitimately entitled by this shameless artifice. The state is liable for money damages, expungement, and ancillary relief under 42 U.S.C. § 1988.

Liability having been adjudicated hereby, counsel for the parties are directed to meet and confer with the court on September 23, 1986 at 8:30 a.m. for preliminary consideration of a schedule of further hearings anent (i) class certification, (ii) determination of the amount of the damage awards in

---

that a defendant have knowledge of the falsity of the statements and an intent to deceive." *McGovern v. Crossley*, 477 A.2d 101, 103 (R.I. 1984) (citations omitted). As this court noted above, Martin's statement to the parents that their "child's birth certificate will not be acceptable for registration until all the missing items have been completed, or until their omission has been satisfactorily accounted for," was patently untrue. In this court's view, given the *Coulter* decree and the awareness of it which all of the defendants plainly possessed, common sense requires a finding that the Registrar intended to deceive the plaintiffs (and others) when he made these false statements. By attempting deliberately to mislead, Martin "breach[ed] some duty owed to [the plaintiffs] in their individual capacities and not merely ... some obligation owed the general public."

*Ryan v. State of Rhode Island, Department of Transportation*, 420 A.2d 841, 843 (R.I.1980).

This court therefore concludes that with respect to the plaintiffs' damages claims, both the state and its officials sued in their representative capacities have waived any entitlement to eleventh amendment immunity. *See Hawaii v. Gordon*, 373 U.S. at 58, 83 S.Ct. at 1052; *Dugan v. Rank*, 372 U.S. at 620, 83 S.Ct. at 1006. Likewise, the eleventh amendment in no way prevents this court from considering the request for expungement of records. *See Green v. Mansour*, — U.S. ——, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 105–06, 104 S.Ct. 900, 910–11, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan*, 415 U.S. 651, 664–71, 94 S.Ct. 1347, 1356–60, 39 L.Ed.2d 662 (1974).

favor of each plaintiff, (iii) implementation of the expungement remedy, and (iv) assessment of counsel fees and costs in favor of the prevailing plaintiffs.

So ordered.