**Crystal GRENDELL, Plaintiff,**

v.

**James GILLWAY, et al., Defendants.**

**Civ. No. 96–257–B.**

United States District Court,
D. Maine.

July 11, 1997.

---

48

Jed Davis, Jim Mitchell & Jed Davis, P.A., Augusta, ME, for Plaintiff.

Michael E. Saucier, Thompson & Bowie, Portland, ME, for Defendants Stanko & MSAD 56.

Edward R. Benjamin Jr., Preti Flaherty Beliveau & Pachios, Portland, ME, for Defendants Gillway & Town of Searsport.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, Crystal Grendell, sued Sergeant James Gillway, the Town of Searsport, Maine ("the Town"), the Maine School Administrative District 56 ("SAD 56"), and Charisse Stanko, a guidance counselor at the Searsport Elementary School in SAD 56, pursuant to 42 U.S.C. § 1983, alleging violations of her civil rights under the United States Constitution. Grendell also alleged supplemental state claims under the Maine Constitution. Specifically, Grendell contends that Defendants violated her substantive due process rights as guaranteed by the Fourteenth Amendment of the United States Constitution and Article 1, Section 6–A of the Maine Constitution. Grendell further alleges that Defendants Gillway and the Town are liable for an unreasonable seizure of her person executed by Gillway in violation of her rights under the Fourth Amendment of the United States Constitution and Article I, Section 5 of the Maine Constitution.

Defendants Gillway and the Town and Defendants SAD 56 and Stanko moved separately for summary judgment as to the respective claims asserted against them. For the reasons set forth in detail below, the Court denies Gillway's Motion for Summary Judgment as to the substantive due process claims asserted against him, and grants summary judgment as to the substantive due

process claims asserted against Stanko, SAD 56, and the Town. Finally, the Court finds that genuine issues of material fact exist as to Grendell's claims that Gillway performed an unreasonable seizure of her person and therefore denies Gillway's Motion for Summary Judgment as to this claim. The Court, however, finds that no genuine issues exist as to the Town and grants summary judgment in its favor as to Grendell's seizure claim.

## I. Summary Judgment

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida– Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). The Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## II. Background

In April 1991, Crystal Grendell was a sixth grade student at the Searsport Elementary School in SAD 56. She was eleven years old at the time. In mid-April Charisse Stanko, the guidance counselor at the school, called Grendell out of class and for reasons unknown to Grendell asked her whether her parents abused drugs. Grendell alleges that although she was hesitant to answer, Stanko assured her that "nothing would happen." Aff. of Crystal Grendell, May 13, 1997, at ¶ 3. Grendell thereafter explained that her parents smoked marijuana "[o]nce in a while."

During the days subsequent to this initial meeting, Stanko removed Grendell from class several times to inquire further into her relationship with her parents and to determine how Grendell was feeling. Stanko finally suggested that Grendell go to the police station so that she could talk with Sergeant James Gillway about her parents' use of marijuana. Grendell was familiar with Gillway because Gillway was the DARE officer at Grendell's school and had been to Grendell's class. On April 29, 1991, Grendell went to the police station to talk to Gillway; however, Gillway was too busy to talk so Grendell left before she could discuss her parents' use of marijuana. *Id.* at ¶ 5.

The next day, April 30, 1991, Stanko again called Grendell out of class and brought Grendell to her office. There Gillway and two other DARE police officers, in the presence of Stanko, questioned Grendell about her parents' drug use. Gillway told Grendell that "if [she] 'cooperated' and told him about [her] parents' use of marijuana, nothing would happen to [her] parents, but that, if [she] did not 'cooperate,' [her] parents would be arrested." *Id.* at ¶ 7. Gillway also told Grendell that "if [she] did not tell him about [her] parents' use of marijuana, [her] parents and [she] would be 'in a lot of trouble.' " *Id.* Further, Gillway warned Grendell not to tell her parents about her talking to the police officers because "often parents beat their children after the children talk to police." *Id.* Grendell proceeded to answer Gillway's questions about her parents' schedules, where they worked, and the architectural plan of her house. Additionally, she told him and the other officers that her parents were growing marijuana plants under grow lights in a closet, that her parents smoked the marijuana in the house, that there was a bag of marijuana behind the couch in the living room, and that her parents kept guns in their bedroom. *Id.* at ¶ 9. Gillway told Grendell that the police would go to her house that afternoon to look for drugs and that the police would be there when she got off the school bus. *Id.* at ¶ 8. He told her that she would not be permitted to stay at her home at that time because "in most cases like this, children are beaten by their parents." *Id.*

When Grendell and her younger sister emerged from the school bus at their home that afternoon, police cars were positioned around their house. Gillway put Grendell in a police car and she was taken immediately to the police station. Gillway contends that Grendell was taken to the police station in order to create a "cooling off period" because he was advised by DHS personnel that it

would be best for Grendell if she were separated from her parents at this potentially volatile time. Aff. of James Gillway, April 24, 1997, at ¶ 10. Once she arrived at the station, Grendell was placed in a locked room, where she was joined soon thereafter by Gillway. Aff. of Crystal Grendell, at ¶ 13. When Grendell's mother arrived at the police station crying, she asked the officers where they had taken Grendell. Grendell heard her mother crying and asked Gillway if she could tell her mother where she was. Gillway said that she could not "and told [her] to sit down and shut up." *Id.* At Grendell's request, Gillway then called Lori Conlon, Grendell's aunt, and asked her to take Grendell to the house of Carol Nelson, who was once married to Grendell's grandfather. When Conlon arrived, Gillway put Grendell in Conlon's car. Another officer told Grendell to crouch on the floor so that she would not be seen as Conlon drove her out of town. A police car followed Conlon's car as she drove away with Grendell hiding on the floor. *Id.*, at ¶ 15.

After· Grendell was taken to Nelson's home, Kent Wyman, Grendell's uncle, discovered where Grendell was and came to retrieve her. Grendell told Gillway that she wanted to leave with Wyman. Gillway, believing that the "cooling off" period had passed, told Wyman that Grendell was not in police custody and therefore did not oppose this suggestion. Aff. of James Gillway, at ¶ 15. Grendell left with Wyman. She contends· that although her parents came by Wyman's house to see her that night, she did not return home until the next morning.

### III. Substantive Due Process

The Court begins by noting that Defendants assert the affirmative defense of qualified immunity. Such immunity relieves public officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It is axiomatic, however, that "before ·even reaching qualified immunity, a court ... must ascertain whether

the [plaintiff] has asserted a violation of a constitutional right at all." *Watterson v. Page,* 987 F.2d 1, 7 (1st Cir.1993). Accordingly, the Court will proceed with an analysis of whether Defendants have, in fact, violated Grendell's substantive due process rights and address Defendants' qualified immunity defense thereafter if necessary.

▇ The Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. Unlike its procedural counterpart, substantive due process protects citizens from "certain government actions regardless of the fairness of the procedures used to implement them...." *Daniels v.. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). There are currently two tests by which courts examine substantive due process claims. Under the first test, a plaintiff does not need to allege a violation of a specific liberty or property interest; rather, he must demonstrate that the state's conduct "shocks the conscience." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Under the second test, a plaintiff must demonstrate a violation of a specific liberty or property interest protected by the Fourteenth Amendment. *See Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042(1923).

Grendell argues that Defendants violated her substantive due process rights by using her, or by allowing her to be used, to elicit incriminating information about her parents. The Court is persuaded that only Defendant Gillway may be liable for a substantive due process violation and therefore grants summary judgment as to Defendants Stanko, SAD 56, and the Town on this issue.

### A. Shocks the Conscience

In *Rochin v. California,* the Supreme Court held that the forcible pumping of a suspect's stomach by police to obtain evidence that would inculpate the suspect at trial "shocks the conscience[,]" thus violating the suspect's due process rights. *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952). The Court explained that in order to amount to a due

process violation the police conduct must "do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically." *Id.* Nevertheless, the conduct complained of in *Rochin,* the Court held, was "too close to the rack and the screw to permit of constitutional differentiation." *Id.*

## 1. Gillway

█ The conduct alleged here similarly may be characterized as shocking to the conscience. Grendell alleges that Gillway told her in Stanko's office that if she did not "cooperate" and tell him about her parents' drug use then she would be "in a lot of trouble" and her parents would be arrested. This, coupled with his other alleged statement that if Grendell did tell him about her parents' drug use nothing would happen to her parents, shocks the Court's conscience. The lying to and threatening of an eleven year old girl by the police in order to force her to incriminate her parents is contemptible and exceeds all notions of fair play and decency. It is not as if Grendell alleges that she volunteered the information freely and without reservation; rather, Grendell surely felt as if she had no choice but to answer the policeman's questions. This type of coercive extraction of indicting information from an eleven year old girl about her parents is reprehensible behavior unworthy of constitutional protection.

This finding is not in conflict with relevant First Circuit case law. Although the Circuit has never held that verbal harassment can constitute conscience-shocking behavior, it has never foreclosed this issue either. In *Pittsley v. Warish,* 927 F.2d 3, 5–7 (1st Cir. 1991), the court found that the conduct of a police officer who told a four year old child and a ten year old child that "if we ever see your father ... on the streets again, you'll never see him again[,]" did not shock the conscience. Even though the police would not let the children "hug and kiss" their father goodbye after he was arrested, the court held that "[t]he children's alleged fear or trauma which resulted from these spoken words and actions ... is not sufficient to rise to the level of a constitutional violation under the standard enunciated in *Rochin.*" *Id.* at 7. The court noted, however, that "[t]his does not mean that under no circumstances will verbal threats or harassment rise to the level of a constitutional violation." *Id.* at 7 n. 3. Likewise, in *Souza v. Pina,* 53 F.3d 423 (1st Cir.1995), the court held that the behavior of a prosecutor who had conducted press conferences where he encouraged the media to attribute a number of serial murders to the plaintiff's son did not shock the conscience even though the plaintiff alleged that the prosecutor should have known about her son's suicidal tendencies and would have killed himself as a result of the accusations. As in *Pittsley,* the court stated that "we do not foreclose the possibility that a government official's statements or other forms of psychological harm may constitute a violation of a citizen's substantive due process rights ..." *Id.* at 427 (citations omitted). Finally, the court in *Brown v. Hot, Sexy and Safer Prods., Inc.,* 68 F.3d 525 (1st Cir.1995), held that requiring minor teenagers to attend a sexually explicit AIDS awareness assembly without prior parent approval did not shock the conscience.

Perhaps the most relevant of this group of cases is the *Pittsley* decision because it involved a policeman, young children, the children's father, and verbal harassment. Nevertheless, the facts alleged at bar are distinguishable for one specific reason: The children in *Pittsley* were not presented with a "Sophie's Choice" situation, where they could either "rat" on their parents to the police or ostensibly be "in a lot of trouble." The villainy of Gillway's alleged tactics is all the more clear when considering that he told Grendell not to tell her parents about their conversation because "in most cases like this, children are beaten by their parents." The *Pittsley* children, although naturally traumatized by what was said and by not being permitted to "hug and kiss" their father goodbye, never were bullied or manipulated by the police as a means to incriminate their parents. The alleged conduct here, instead, strikes at the basic fabric of all parent-child relationships: love, trust, and faith. Each of these may have been irreparably harmed, not as a result of independent and voluntary actions by either

Grendell or her parents, but because Gillway threatened Grendell in such a way as to turn her into an unwilling informant against her own parents. Accordingly, although the Court is mindful that the First Circuit has never held verbal threats or harassment to constitute conscience-shocking behavior, the Court is equally mindful that abhorrent conduct is still abhorrent even though it has not been subject to judicial determination. For these reasons, the Court finds that, lack of direct precedent notwithstanding, Gillway's alleged conduct is shocking to the conscience and violative of Grendell's substantive due process rights.[1]

■ Since the Court finds that Grendell has alleged that Gillway violated a constitutional right, it is now appropriate to turn to the issue of qualified immunity and, consequently, the question of whether this right was clearly established at the time Gillway acted. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The Court is persuaded that Grendell's right to be free from behavior that is shocking to the conscience was clearly established at the time of Gillway's alleged conduct and therefore holds that Gillway is not entitled to qualified immunity.

In *Fernandez v. Leonard*, 784 F.2d 1209 (1st Cir.1986), the First Circuit held that "the very concept of a violation of substantive due process is that the conduct complained of is *impermissible per se* and is thus *necessarily clearly established.*" *Id.* at 1216 (emphasis added). Likewise, in *deLeiris v. Scott*, 642 F.Supp. 1552 (D.R.I.1986) (Selya, District Judge), the court, citing *Fernandez*, stated

that violations of substantive due process are "impermissible per se," *see id.* at 1567, and interpreted *Rochin* as standing for the "principle that 'conduct that shocks the conscience' is inherently violative of due process." *Id.* at 1568. The Seventh Circuit also has stated that "[a] constitutional violation that is so patent that no violator has even attempted to obtain an appellate ruling on it can be regarded as clearly established even in the absence of precedent." *Anderson v. Romero*, 72 F.3d 518, 526–27 (7th Cir.1995).

■ The Court is persuaded that a reasonable person who engages in conscience-shocking behavior should know at the time that he is violating an individual's substantive due process rights, regardless of whether such conduct has previously been subject to judicial scrutiny. Conduct that clearly shocks the conscience, such as that involved here, does not require quiet deliberations to conclude that it is violative of due process; rather, it is "in and of itself . . . egregiously unacceptable [and] outrageous . . . [,]" *Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990), and should be clearly repugnant to a reasonable officer required to act on the spur of the moment. Simply because there is no clearly defined case law condemning certain conduct does not mean police officers should be free to engage in such conduct, no matter how offensive or destructive to a fair and just society that conduct may be, and then hide behind the shield of qualified immunity. The Court is convinced, therefore, that even in the absence of precedent, conduct that shocks the conscience is so patently egregious that the constitutional right it violates is necessarily clearly established and that a reasonable officer should know that his conduct violates that right. Accordingly, the Court denies Gillway's request for qualified immunity.

---

1. For other examples of conduct found to be conscience-shocking by district courts within the First Circuit, see *deLeiris v. Scott*, 642 F.Supp. 1552, 1569 (D.R.I.1986) (Selya, District Judge) (holding that a state registrar of vital statistics who lied to parents in order to obtain sensitive information, such as the number of miscarriages, stillbirths, or abortions the mother has had, before allowing them to receive birth certificates for their babies shocks the conscience); *United*

*States v. Levasseur*, 699 F.Supp. 995, 1007 (D.Mass.1988) (holding that the bribery of a minor child by a police officer in order to obtain incriminating information about the child's parents shocks the court's conscience). *But see United States v. Penn*, 647 F.2d 876, 880–82 (9th Cir.1980) (holding that, under the totality of the circumstances, the bribery of a child to inculpate his parents did not shock the conscience).

## 2. The Town, Stanko and SAD 56

██ A municipality cannot be held liable under § 1983 absent a showing that it "maintained a policy or custom which caused, or was the moving force behind, a deprivation of constitutional rights." *McCabe v. Life–Line Ambulance Serv., Inc.,* 77 F.3d 540, 544 (1st Cir.1996). "If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). An authorized decisionmaker, for these purposes, is one who can "establish governmental policy . . . ." *Id.* The Court finds that there is no genuine issue as to whether the Town had a policy of allowing its police officers to engage in the sort of conduct allegedly committed by Gillway. There is similarly no genuine issue as to whether Gillway's alleged conduct was authorized by one of the Town's decision makers. Accordingly, the Town cannot be liable under § 1983 for Gillway's alleged conduct the Court finds to be shocking to the conscience.

██ Further, there is no genuine issue as to whether Stanko's alleged behavior shocks the conscience. That Stanko did not seek the consent of Grendell's parents before permitting Gillway to interrogate Grendell can hardly be said to "offend the community's sense of fair play and decency." *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952). Absent a finding of liability on the part of Stanko, therefore, SAD 56 also is immune from liability as to Stanko's conduct in so far as her conduct does not shock the conscience. *See Monell v. New York Dept. of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

### B. Liberty Interest

██ As explained above, Defendants also may be liable for violating Grendell's substantive due process rights if Grendell can demonstrate a violation of a specific liberty or property interest protected by the Fourteenth Amendment. *See Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923). Grendell's alleged liberty interest in this matter is her right "to maintain familial relationships without unwarranted governmental intrusion." Pl.'s Opp. to Mots. for Sum. J. of Def's Town of Searsport and Gillway and of Def.'s SAD 56 and Stanko at 2–3. She contends that her right to maintain familial relationships includes the right not to be used as an informant against her parents. The Court is not persuaded that Grendell has such a liberty interest.

In *Pittsley v. Warish,* 927 F.2d 3 (1st Cir.1991), the First Circuit held that "in order to establish a violation of a right to familial associational privacy, the state action must be directly aimed at the parent-child relationship." *Id.* at 8. The court further explained, "State action that affects the parental relationship only incidentally, however, even though the deprivation may be permanent, as in the case of unlawful killing by the police, is not sufficient to establish a violation of an identified liberty interest." *Id.* The alleged conduct here is not directly aimed at the parent-child relationship, as it was in *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights), or *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) (determining paternity). Although the result of Gillway's alleged actions ultimately may have led to a permanent physical separation of Grendell from her parents, his sole purpose was to pursue a criminal investigation of illegal drug use by Grendell's parents. Similarly, Stanko's conduct was not directly aimed at the parent-child relationship. For these reasons, Grendell has not alleged a violation of a specific liberty interest protected by the Fourteenth Amendment. Moreover, it should be noted that Grendell's contention that she has a right not to be used as an informant against her parents is incorrect. In *Watterson v. Page,* 987 F.2d 1 (1st Cir. 1993), the court held that "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." *Id.* at 8. Accordingly, the mere fact that Grendell was used to obtain incriminating information about her parents does not constitute a violation of a protected liberty interest.

## IV. Illegal Seizure

The Fourth Amendment of the United States Constitution declares, "The right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated.... "U.S. Const. Amend. IV. Grendell alleges that Gillway committed an unreasonable seizure of her person when he interrogated her at school without prior parental notification and when he kept her away from her parents after she emerged from the school bus at her house. She also claims that Gillway unreasonably seized her during his questioning of her at the school. Grendell contends that the Town is liable for Gillway's actions. The Court finds that genuine issues of material fact exist as to Grendell's Fourth Amendment claim and denies Gillway's Motion for Summary Judgment on this issue. The Court, however, finds that no genuine issues exist as to the involvement of the Town and grants summary judgment in its favor on this issue.

██ . Gillway argues that he should not be liable for an unreasonable seizure of Grendell because he was merely exercising the function of a police officer commonly referred to as "community caretaking." *See Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). This phrase "is a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." *United States v. Rodriguez–Morales,* 929 F.2d 780, 785 (1st Cir.1991). These activities are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* (citing *Cady. v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973)). Further, "[t]he imperatives of the fourth amendment are satisfied in connection with the performance of such noninvestigatory duties, including community caretaker tasks, so long as the procedure employed (and its implementation) is reasonable." *Id.*

██ The Court finds that there are genuine issues of material fact as to whether Gillway's separation of Grendell from her parents, and his alleged refusal to let Grendell tell her mother where she was located, was in fact a reasonable exercise of his role as a community caretaker, to wit, protecting Grendell from potential bodily harm, This issue is more properly suited for determination by a jury. The Court holds, however, that Gillway's questioning of Grendell did not constitute a seizure since there is no indication, even viewing the evidence in the light most favorable to Grendell, that she was not free to leave at any time she chose. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (footnote omitted). Finally, the Court is persuaded that the Town may not be liable for any seizure of Grendell because there is no evidence that the Town had a policy of allowing its police officers to engage in the sort of conduct allegedly committed by Gillway, *see McCabe v. Life–Line Ambulance Serv., Inc.,* 77 F.3d 540, 544 (1st Cir.1996), or that Gillway's alleged conduct was authorized by one of the Town's decision makers. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986).

## V. Conclusion

The Court holds that Gillway's alleged conduct shocks the conscience and thus he may be liable for violating Grendell's substantive due process rights. The Court also holds that Gillway may be liable for an unreasonable seizure of Grendell. The Court finds, however, that the Town, Stanko, and SAD 56 are relieved from liability regarding Grendell's substantive due process claims and her unreasonable seizure claims and accordingly grants summary judgment in their favor.

*SO ORDERED.*