# United States Court of Appeals
## For the First Circuit

_____

No. 99-1675

MARITZA CRUZ-ERAZO; JUAN R. GASCOT-VAZQUEZ;
CONJUGAL PARTNERSHIP GASCOT-CRUZ;
KORAL GASCOT-CRUZ; JUAN R. GASCOT-CRUZ;
KASSANDRA JAANAI GASCOT-CRUZ;

Plaintiffs, Appellants,

v.

CARLOS JAVIER RIVERA-MONTAÑEZ, MEMBER OF THE
PR POLICE FORCE IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY; CARI RUIZ-MCANALLEN, MEMBER OF THE PR
POLICE FORCE IN HER INDIVIDUAL AND OFFICIAL CAPACITY;
CONJUGAL PARTNERSHIP RIVERA RUIZ, MEMBERS OF THE
PR POLICE FORCE IN THEIR INDIVIDUAL AND OFFICIAL
CAPACITIES; HUMBERTO THILLET-GUZMAN, CAPTAIN,
MEMBER OF THE PR POLICE FORCE IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY; HECTOR QUIÑONES, LIEUTENANT,
MEMBER OF THE PR POLICE FORCE IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY; HECTOR MORALES-SILVA, MEMBER
OF THE PR POLICE FORCE IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY; JOHN DOE, 97CV1758; RICHARD ROE, 97CV1758;

Defendants, Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

_____

Before

Torruella, Chief Judge,

Coffin, Senior Circuit Judge,

and Lipez, <u>Circuit Judge</u>.

_____

        <u>Jane Becker Whitaker</u>, with whom <u>Troncoso & Becker</u> was on brief, for appellants.
        <u>Sylvia Roger Stefani</u>, Assistant Solicitor General, Department of Justice, with whom <u>Gustavo A. Gelpí</u>, Solicitor General, and <u>Edda Serrano-Blasini</u>, Deputy Solicitor General, were on brief, for appellees Héctor Quiñones and Héctor Morales.

_____

May 2, 2000

_____

**TORRUELLA, Chief Judge.** Appellants Maritza Cruz-Erazo, Juan R. Gascot-Vázquez, Koral Gascot-Cruz, Juan R. Gascot-Cruz, and Kassandra Jaanai Gascot-Cruz allege that appellees police officers Carlos Javier Rivera-Montañez, Cari Ruiz-Mcanallen, Humberto Thillet-Guzmán, Héctor Quiñones, Héctor Morales-Silva, and John Doe, in their individual and official capacities, engaged in ongoing harassment and intimidation of appellants in violation of their rights to due process of law. The district court dismissed the complaint on the ground that appellants had failed to state a claim under 42 U.S.C. § 1983. Although we find appellees' alleged conduct disgraceful, it does not sufficiently "shock the conscience" so as to state a claim under § 1983. Because this is the only argument advanced on appeal, we affirm the decision of the district court.

## I. FACTS

The following is a summary of the facts alleged in appellants' complaint, presented in the light most favorable to the appellants. Our summary largely tracks that of the district court. See Cruz-Erazo v. Rivera-Montañez, Civ. No. 97-1758, slip op. at 3 (D.P.R. Mar. 31, 1999) (hereinafter "Opinion").

On September 3, 1995, appellant Cruz-Erazo was approached by appellees Ruiz-Mcanallen and her husband Rivera-Montañez. Stating that they were concerned about the oncoming Hurricane Luis, Ruiz-Mcanallen and Rivera-Montañez asked Cruz-Erazo whether they could store some

personal property at an unoccupied house owned by Cruz-Erazo and her husband, appellant Gascot-Vázquez. Cruz-Erazo agreed and gave Ruiz-Mcanallen and Rivera-Montañez a key to the house, which was located on San Gregorio Street in San Juan, Puerto Rico.

For approximately four months following Hurricane Luis, Cruz-Erazo tried on several occasions to retrieve the key to the house from appellees, without success. She eventually learned that Ruiz-Mcanallen and Rivera-Montañez were not merely storing items at the house but actually residing there with a third person. When Cruz-Erazo went to the house to confront appellees, Ruiz-Mcanallen told her that if she "did not like the situation[,] she could call the police, but Officer Rivera[-Montañez] told her to remember that he was a member of the force."

Cruz-Erazo sought the assistance of a local district attorney, who advised her to file a complaint for damages. However, when she went to the police station, the officers there refused to accept the complaint when they learned that it was against fellow police officers.

Cruz-Erazo next sought the advice of a local judge, who informed her that nothing prevented her, as the legitimate owner of the house, from retaking possession and changing the locks, etc. When Cruz-Erazo then returned to the district attorney's office, she was told that the office would not involve itself in civil matters and that

she should retain counsel to help her resolve the situation. Cruz-Erazo then went to another courthouse, where she spoke with a marshal on duty and with yet another judge, who confirmed that, as rightful owner of the property, she could lawfully enter the house and change the locks.

On the morning of January 5, 1996, appellant Cruz-Erazo called the Bayamón South police precinct and requested that the police witness her entrance into the house on San Gregorio Street. She was told that a Sergeant Díaz would meet her at her home. Instead, however, appellees Thillet-Guzmán and Quiñones, from the Bayamón North precinct, appeared at appellants' home. This raised suspicions with Cruz-Erazo, who asked her husband to accompany her to the house and to bring a camera.

Once at the San Gregorio Street residence, Officers Thillet-Guzmán and Quiñones refused to accompany Cruz-Erazo into the house. Cruz-Erazo tried to phone Sergeant Díaz, but she was unable to reach him and decided to enter the house anyway. Once inside, she removed some blinds and other items belonging to her and her husband, and she changed the locks. When Cruz-Erazo and her husband tried to drive away from the house, appellee Ruiz-Mcanallen and her son stood in the road to block their way and began to insult and threaten them. During this exchange, Officer Thillet-Guzmán approached Cruz-Erazo and told her "this won't end here."

-5-

That same day Cruz-Erazo received a citation for disturbing the peace from appellee Rivera-Montañez, apparently in response to the day's events on San Gregorio Street. Cruz-Erazo and her husband also filed a complaint against Ruiz-Mcanallen's son for disturbing the peace, but no action was ever taken on it.

Two days later, on January 7, 1996, appellants were informed that the new locks on the San Gregorio Street house had been broken. Cruz-Erazo drove to the house and photographed the broken padlocks and then proceeded to the police station to file a complaint for burglary. Once there, she was told by a supervising officer that her complaint could not be accepted "because that house belongs to Officer Carlos J. Rivera Montañez." Cruz-Erazo was then informed that an assistant district attorney had apparently ordered that the locks be broken to return possession of the house to Rivera-Montañez. When Cruz-Erazo went to the district attorney's office to file a complaint, she was ordered to leave the office. Cruz-Erazo then went to the Bayamón South precinct, where she waited for several hours before she was informed that charges of burglary and disturbing the peace had been filed against her for entering the San Gregorio Street residence.

On February 1, 1996, Cruz-Erazo was informed by a neighbor that there was a strange car parked in front of the San Gregorio Street residence and that the porch door was open. Cruz-Erazo called 911 and accompanied the responding officers to the house. While the officers

were inspecting the property, appellee Ruiz-Mcanallen and her son arrived. Ruiz-Mcanallen claimed that she was renting the house, but when pressed for the name of the person to whom she paid rent, she told Cruz-Erazo to talk to Officer Quiñones if she wanted to collect rent.

The following day an individual claiming to be an off-duty police officer arrived at Cruz-Erazo's home and ordered her to appear in the Bayamón North precinct (without giving more reasons). She refused.

During the following weeks, appellants allege that they suffered continuing harassment by appellees. They received a number of threatening phone calls, many of which threatened physical violence against Cruz-Erazo. Patrol cars passed the house frequently, at least once a night, and on one occasion Officer Rivera-Montañez appeared at the door and threateningly asked Gascot-Vázquez if his daughter was "the light of his life." At one point, Cruz-Erazo went to the FBI in search of assistance, and a call from an agent to the local police succeeded in temporarily halting the harassment.

On February 14, 1996, appellee Morales-Silva served Cruz-Erazo with a citation to appear in court on February 20, 1996 to face the burglary charges against her.

On February 19, 1996, appellee Rivera-Montañez was served with notice of an eviction action initiated against him by Cruz-Erazo and Gascot-Vázquez. Rivera-Montañez called Cruz-Erazo at home and

threatened that "she would pay for having him served." The next day, February 20, 1996, Officer Rivera-Montañez appeared at Cruz-Erazo's home and insulted her and "called into question her honor." Although Cruz-Erazo ignored his comments and went inside, her pregnant daughter, Koral Gascot-Cruz objected to Rivera-Montañez's comments and asked him to leave. The officer insulted her and pushed her out of the way as he left. Appellants allege that "two days later, Mrs. Gascot Cruz lost her baby, apparently because the placenta was detached from the womb." The eviction suit was heard that same day and resolved in favor of Cruz-Erazo and Gascot-Vázquez.

Also on February 20, 1996, Cruz-Erazo appeared at the Bayamón courthouse to face the burglary charges against her. She was told that the judge was at lunch, and she left the courthouse for a short period. In her absence, the judge heard testimony from Officers Rivera-Montañez and Ruiz-Mcanallen and received sworn statements from Officers Thillet-Guzmán and Quiñones. On the basis of such evidence, and without hearing from Cruz-Erazo, the judge ordered her arrest and posted bail at $50,000. When Cruz-Erazo was informed of this, she initially refused to post bail, but she reconsidered when a friend overheard appellee Officer Morales-Silva on the telephone saying that they had finally gotten "the troublemaker" and suggesting that she would be murdered on her way to the jail. Cruz-Erazo was booked and fingerprinted, although at least one officer assigned to the task

refused to fingerprint her, saying that he did not want to participate in such a miscarriage of justice.

A preliminary hearing was held in the burglary action on May 14, 1996. Officer Thillet-Guzmán testified that he had seen Cruz-Erazo remove property from the San Gregorio Street residence, although he did not explain why he did not arrest her if he considered it a burglary in progress. Officer Rivera-Montañez also testified, but he was unable to provide any evidence whatsoever of a right to occupy the San Gregorio Street house. When the court asked Rivera-Montañez why he should be believed, he responded simply that he was a police officer and that the police always tell the truth. Cruz-Erazo presented substantial evidence that she and her husband owned the property, including the deed and an appraisal, and the judge ordered the burglary charges dismissed.

After this ordeal, appellants moved for a time to South Carolina, but they eventually returned to Puerto Rico and filed this action. Since their return, appellants allege that appellees Rivera-Montañez and Ruiz-Mcanallen have intentionally driven past their home, possibly as an attempt to intimidate appellants.

## II.   PROCEDURAL HISTORY

Appellants' complaint, brought pursuant to 42 U.S.C. § 1983, asserted two causes of action. The first claimed that appellees had violated appellants' "Fourteenth Amendment right to due process when

-9-

they deliberately lied in official documents and perjured themselves in official court proceedings with the intention of causing plaintiffs harm." The second cause of action stated a claim under the Civil Code and Constitution of Puerto Rico, essentially for malicious prosecution.

Appellees Morales-Silva, Quiñones, and Thillet-Guzmán moved for dismissal under Federal Rule of Civil Procedure 12(b)(6), claiming that appellants had failed to "prove" a claim under § 1983, that they were entitled to qualified immunity, and that the action was barred by the Eleventh Amendment. Although the court noted that appellees had not explicitly argued that the complaint failed to state a cause of action (as opposed to proving a claim), it nevertheless accepted the appellees' position and dismissed the complaint as against all defendants.[1]

The district court first stated that appellants' complaint could be construed as presenting a claim under the Fourteenth Amendment for malicious prosecution. The court rejected such claim, however, correctly noting that "[t]here is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecution." Opinion at 7 (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d

_____

[1] Oddly enough, appellees Rivera-Montañez and Ruiz-Mcanallen have filed no documents with this Court, nor has any counsel made an appearance on their behalf (nor does the Appendix filed on appeal bear any indication of their participation before the trial court). However, because we affirm the district court's determination that appellants have failed to state a claim, the nonparticipation of appellees Rivera-Montañez and Ruiz-Mcanallen makes no difference to our consideration of the case.

-10-

249, 256 (1st Cir. 1996)). The court noted that a constitutional malicious prosecution claim might arise under the Fourth Amendment, but held that such a Fourth Amendment claim had not been raised by appellants. See id. (citing Meehan v. Town of Plymouth, 167 F.3d 85, 88 (1st Cir. 1999)).

The court then proceeded to a more general § 1983 analysis. The court found that appellants had not alleged sufficient causation between appellant Gascot-Cruz's miscarriage and the appellees' alleged actions. The court also found that the other allegations of intimidation and harassment did not rise to the level of a constitutional deprivation actionable under § 1983, because they did not "amount to a deprivation of [appellants'] liberty interest" nor "rise to a level of intrusion that would 'shock the conscience.'" See id. at 11. The court therefore dismissed appellants' federal claims, as well as their supplemental state law claims. Appellants timely appealed, and we now affirm the decision of the district court.

**III. LAW AND APPLICATION**

We review the district court's dismissal for failure to state a claim de novo. See, e.g., Souza v. Pina, 53 F.3d 423, 424 (1st Cir. 1995). The question before us is whether, when viewing the allegations in appellants' complaint in the light most favorable to appellants, their complaint states a claim under 42 U.S.C. § 1983. As is well established, § 1983 creates no independent substantive rights, but

-11-

rather provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law. See, e.g., Albright v. Oliver, 510 U.S. 266, 811 (1994). Hence the requirement that, to state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law. See, e.g., Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991) (citing Parratt v. Taylor, 451 U.S. 527, 535 (1981)).

Appellants' complaint alleges that "Defendants violated Plaintiffs' Fourteenth Amendment right to due process of law when they deliberately lied in official documents and perjured themselves in official court proceedings with the intention of causing Plaintiffs harm." Counsel clarified at oral argument that appellants' claim is that their substantive (rather than procedural) due process rights were violated.[2] As we have previously stated:

> There are two theories under which a plaintiff may bring a substantive due process claim. Under the first, a plaintiff must demonstrate a

---

[2] Although the district court mentioned the possibility of a Fourth Amendment claim on the facts alleged in the complaint, and although this possibility was raised by the Court at oral argument, we need not venture into this subject because the appellants failed to raise any Fourth Amendment theory of recovery before the district court or in their brief on appeal, and have therefore waived any such claim. See, e.g., Rivera-Gómez, 843 F.2d 631, 635 (1st Cir. 1988) ("[A] litigant has an obligation 'to spell out its arguments squarely and distinctly' or else forever hold its peace." (citation omitted)).

> deprivation of an identified liberty or property
> interest protected by the Fourteenth Amendment.
> Under the second, a plaintiff is not required to
> prove the deprivation of a specific liberty or
> property interest, but, rather, he must prove
> that the state's conduct "shocks the conscience."

Brown v. Hot, Sexy & Safer Productions, Inc., 68 F.3d 525, 531 (1st Cir. 1995) (citations omitted); see Pittsley, 927 F.3d at 6. Because appellants have not specified any particular constitutionally protected interest of which they were deprived by appellees' actions,[3] we will follow the parties' lead and focus our inquiry on the second theory.

We have used various phrases to describe when state action "shocks the conscience" in the context of substantive due process.

> It has been said, for instance, that substantive
> due process protects individuals against state
> actions which are "arbitrary and capricious," or
> those that run counter to "the concept of ordered
> liberty," or those which, in context, appear
> "shocking or violative of universal standards of
> decency."

Amsden v. Moran, 904 F.2d 748, 753-54 (1st Cir. 1990) (citations omitted). We have insisted that "before a constitutional infringement

---

[3] As the Court mentioned at oral argument, the facts alleged in the complaint might appear to support an argument that appellants were deprived of a property interest, insofar as Ruiz-Mcanallen and Rivera-Montañez took possession of the San Gregorio Street residence and retained such possession with the aid of other appellees. However, here again, appellants have entirely failed to articulate such a claim. This "property interest" theory was not raised by the appellants in their memoranda before the district court nor in their briefs submitted to this Court; we think neither court is obliged to dream up and articulate appellants' arguments for them. See Rivera-Gómez, 843 F.2d at 635 (cited in footnote 2, supra).

occurs, state action must in and of itself be egregiously unacceptable, outrageous, or conscience-shocking," id. at 754, and noted the Supreme Court's admonition that "the activities complained of must 'do more than offend some fastidious squeamishness or private sentimentalism,'" Pittsley, 927 F.2d at 7 (quoting Rochin v. California, 342 U.S. 165, 172 (1952)). Although the cases in which we have found governmental conduct to shock the conscience have often involved state action that was highly physically intrusive, see Hot, Sexy & Safer Productions, 68 F.3d at 531 (and cases cited therein), we have pointedly left open the possibility that verbal or other less physical harassment such as that alleged by appellants might rise to a conscience-shocking level, see id. at 532; Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995); Pittsley, 927 F.2d at 7 n.3.

The question now before the Court is whether the particular conduct alleged by appellants in this case was so egregious that it can properly be said, under these circumstances, to shock the conscience. We find the question to be a close one,[4] as the alleged facts seem to fall in between the extremes of conduct which have previously been found to shock or not to shock the judicial conscience. See County of

_____

[4] We might add that our task is made more difficult by the substandard legal memoranda filed before this Court and the district court. Appellants' briefs are long on rhetoric but woefully short on legal substance. Although appellants allege an ongoing scheme of disgraceful conduct by appellees, the Court has been left largely to its own devices to try and connect these factual allegations to any viable legal theory of recovery.

-14-

Sacramento v. Lewis, 523 U.S. 883, 848 (1998) ("[T]he constitutional concept of conscience-shocking . . . points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."). For instance, conscience-shocking state action has been found where a suspect's stomach was forcibly pumped to obtain evidence, see Rochin v. California, 342 U.S. 165 (1952), and where a suspended police officer was required to undergo a penile plethysmograph as a condition of reinstatement, see Harrington v. Almy, 977 F.2d 37, 43-44 (1st Cir. 1992). On the other hand, we have found no constitutional violation where public school students were required to attend a sexually explicit AIDS awareness assembly, see Hot, Sexy and Safer Productions, 68 F.3d at 532, or where an inmate was injured after slipping on a pillow negligently left in a stairwell by a deputy sheriff, see Daniels v. Williams, 474 U.S. 327 (1986).

Some cases, of course, have addressed the hazier middle ground, such as Souza v. Pina, 53 F.3d 423 (1st Cir. 1995), in which we found no due process violation when a murder suspect committed suicide after prosecutors encouraged the media to link him to a series of murders. While we lamented the conduct of the prosecutors in that case, we held that the facts alleged simply did not rise to the level of conscience-shocking conduct. See id. at 427. In another case, Grendell v. Gilway, 974 F. Supp. 46 (D. Me. 1997), the district court found that the behavior of the police "shocked the conscience" when an

-15-

officer lied to and threatened an eleven-year-old girl in order to extract incriminating information about the suspected drug use of her parents. The court noted our decisions in Souza and Pittsley and determined that, although we had never found a constitutional violation under similar circumstances, neither had we foreclosed the possibility that verbal harassment and intimidation could violate due process. See id. at 51. Emphasizing that the officer's behavior struck at "the basic fabric of all parent-child relations: love, trust, and faith," the district court determined that the alleged misconduct, if proven, would violate a right protected by the Due Process Clause. See id. at 52.

Perhaps the case with facts most similar to those alleged by plaintiffs is Pittsley v. Warish, 927 F.2d 3 (1st Cir. 1991). In that case, the defendant police officers allegedly threatened to kill Ms. Pittsley on more than one occasion, told Ms. Pittsley's four- and ten-year-old children that if the police caught their father the children would never see him again, and also refused to allow the children to give the father a goodbye hug when he was arrested. Although the Court refused to condone such "despicable and wrongful" harassment, it held that the conduct did not rise to the level of a constitutional violation. See id. at 7.

Although each determination of whether state conduct "shocks the conscience" is necessarily fact-specific and unique to the

particular circumstances in which the conduct occurred, we think that our precedents steer us toward the conclusion that appellants have failed to articulate a claim under the Fourteenth Amendment. The majority of the conduct alleged by appellants was not physically intrusive or violent, nor did it "strike at the basic fabric" of any protected relationship, such as the parent-child relationship in Grendell. In fact, we find appellants' allegations largely comparable to those presented in Pittsley, and appellants have offered us no basis whatsoever for finding that precedent distinguishable, nor have they offered any substantive argument or explanation to justify the unusual step of finding a violation of substantive due process. As in previous decisions, we expressly leave open the question of whether verbal harassment and intimidation of this general type might, under appropriate circumstances, be found to violate due process. We simply hold that appellants have failed to state such a claim in this case.

Given our conclusion that the conduct alleged by appellants does not sufficiently shock the conscience so as to violate substantive due process, we need not reach the question of whether such conduct was "under color of law." Nor do we reach the appellees' assertion of qualified immunity, although we note that the defense seems, at least at first glance, inappropriate in a case such as this where the conduct is alleged to be an intentional abuse of official power. We also agree

-17-

with the district court that, absent a federal claim, appellants' state law claims are properly left for the consideration of the local courts.[5]

## IV.  CONCLUSION

For the reasons set forth above, we affirm the district court's dismissal of appellants' complaint for failure to state a claim for which relief could be granted.

**Affirmed.**

---

[5]  We are not deaf to appellants' counsel's plea that the conduct alleged in this case warrants some form of judicial reprimand.  Today we hold only that the alleged conduct does not sufficiently "shock the conscience" so as to violate substantive due process.  Because this is the only argument that appellants have advanced on appeal, we affirm the order of the district court.  However, counsel offered at argument that, in the event of an unsuccessful appeal, appellants "can and will" proceed with their case in the local courts.  We do not suggest that appellants have no viable claims under state law (or perhaps even under the Fourth Amendment), and we trust that the local courts will ably judge those claims if they are, in fact, brought.